## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CLARENCE E. HOPKINS, | CASE NO. 1:13-cv-01955-WWC-GBC |
| Plaintiff, | (JUDGE CALDWELL) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION  TO DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 8, 9, 20, 21, 29 |

## REPORT AND RECOMMENDATION

### I.      Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Clarence E. Hopkin's ("Plaintiff") applications for social security disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").  In this case, Plaintiff has a limited education and was sixty-one years old on the date of the ALJ's decision. As a result, application of the Medi-Vocational guidelines ("the grids") would require a finding of disability if claimant was limited to light or sedentary work. However, the ALJ found that claimant had the residual functional capacity to engage in "medium" work. Plaintiff challenges this determination because he alleges foot pain, hand pain, and respiratory problems precluded him from performing medium work. However, seven months after Plaintiff's alleged onset date, Plaintiff noted that his foot pain was at an "acceptable" level, chose not to pursue treatment for his foot pain, and never mentioned foot pain in subsequent medical records. Plaintiff never mentioned hand pain in any medical record during the relevant period, and treated

his hand pain only with over-the-counter topical ointments. Plaintiff only asserted a limitation from respiratory problems, climbing stairs, in one medical record during the relevant period, and the ALJ accommodated for this limitation by restriction him to only occasionally climbing stairs. The only medical opinion evidence from Plaintiff was that he was "unable to work" and "disabled," which are conclusions reserved to the Commissioner, was based only on Plaintiff's foot pain, which disappeared from the medical records seven months later, and was limited to the "present time" and "foreseeable future." This opinion was dated on July 15, 2010, the same day as Plaintiff's alleged onset. Thus, Plaintiff provided no medical opinion evidence that he had an impairment causing limitations that lasted or was expected to last twelve months or more. Plaintiff bears the burden of providing he could not perform his past relevant work, which is generally performed at medium. Plaintiff failed to produce evidence he could not engage in medium work. Based on the forgoing, the Court recommends that Plaintiff's appeal be denied and this case closed.

## II.     Procedural Background

On August 6, 2010, Plaintiff filed an application for SSI under Title XVI of the Social Security Act and for DIB under Title II of the Social Security Act. (Tr. 139-146). The Bureau of Disability Determination[1] denied these applications (Tr. 114-122), and Claimant filed a request for a hearing on November 10, 2010.  (Tr. 127-28). On October 2, 2011, an ALJ held a hearing at which Plaintiff, who was represented by an attorney, and a vocational expert appeared and testified (Tr. 31-69).  On December 7, 2011, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 99-113). On December 23, 2011, Plaintiff filed a request for review

---

[1] The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

with the Appeals Council (Tr. 28-30), which the Appeals Council denied on May 23, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On July 18, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On September 23, 2013, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 8, 9). On February 12, 2014, Plaintiff filed a brief in support of his appeal ("Pl. Brief") (Doc. 20). On March 13, 2014, Defendant filed a brief in response ("Def. Brief") (Doc. 21). Plaintiff filed a brief in reply on June 23, 2014 ("Pl. Reply") (Doc. 29). On April 29, 2014, the Court referred this case to the undersigned Magistrate Judge.

### III.     Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence." Pierce v. Underwood, 487 U.S. 552, 564 (1988). Substantial evidence requires only "more than a mere scintilla" of evidence, Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999), and may be less than a preponderance. Jones, 364 F.3d at 503. If a "reasonable mind might accept the relevant evidence as adequate" to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999); Johnson, 529 F.3d at 200.

### IV.    Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process is used to determine if a person is eligible for disability benefits. See 20 C.F.R. §§ 404.1520, 416.920; see also Plummer, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. See 20 C.F.R. §§ 404.1520, 416.920.  The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

### V. Relevant Facts in the Record

Plaintiff was born on May 15, 1950, and the regulations classified him as "closely approaching retirement" at the time of his alleged onset on July 15, 2010, his application on August 8, 2010, and the ALJ's decision on December 7, 2011. 20 C.F.R. § 404.1563(e). He has a seventh grade education and past relevant work as an assembler and a welder. (Tr. 163). Plaintiff worked continuously from 1967 until 2008, aside from serving for two years in the Marines from 1970 to 1972 and missing a cumulative eighteen months previously in his career due to back problems. (Tr. 52, 235, 353, 633). His longest full-time job was eighteen years. (Tr. 352). Most recently, Plaintiff worked as an assembler for Wal-Mart from 1986 to 1996 and worked as a woodworker in the trucking industry from February of 1996 to July of 2008. (Tr. 187). His earnings record shows that he received unemployment compensation through the fourth quarter of 2009. (Tr. 154). Plaintiff alleges that he cannot work because of a history of substance abuse, foot pain caused by Morton's neuroma, respiratory problems, and pain in his hands caused by arthritis. His alleged onset date is July 15, 2010.

Plaintiff voluntarily reported to inpatient hospital treatment for alcohol abuse on November 19, 2009. (Tr. 354). On admission, he reported that his asthma was a chronic medical

problem that interfered with his life. (Tr. 352). During his hospitalization, Plaintiff received vocational. He explained to vocational counselor Christopher Schmidt that he only had a few weeks of unemployment compensation left, and that he also wanted to pursue vocational rehabilitation. (Tr. 262). Plaintiff also explained that, while on unemployment, he was "making more than [he] would if [he] worked." (Tr. 485). Mr. Schmidt advised him to pursue his GED first, while he still had some financial latitude from his unemployment compensation, and Plaintiff agreed. (Tr. 262). Plaintiff's earnings record shows payments from unemployment through the fourth quarter of 2009, but no payments in 2010 or later. (Tr. 154). Plaintiff followed-up with the VA for help enrolling in the G.E.D. program on December 15, 2009 and January 19, 2010. (Tr. 256, 247).

During his hospitalization Plaintiff reported that he had morning stiffness in his hands for five or ten minutes and that he had increased pain if he overused his hands. (Tr. 294). Plaintiff also reported that he had chronic pain in his feet for many years which was unchanged, (Tr. 300), and occasional cramping in both of his feet (294), but on discharge, had no physical restrictions, was "employable," and cleared for full participation in vocational rehabilitation. (Tr. 217, 475).

On January 4, 2010, Plaintiff saw Dr. Hema Metgud, M.D., a primary care physician, for the first time. (Tr. 250). He was there for a follow-up for hypertension, and Dr. Metgud recommended that he continue his medications and recommended that he exercise. (Tr. 251). Plaintiff also complained of foot pain. (Tr. 250).  However, an exam of his foot was normal. (Tr. 251). Dr. Metgud ordered an x-ray and noted that she would refer him to podiatry as needed. (Tr. 251). He reported a diagnosis of asthma, but his breathing was stable and his lungs were clear for

auscultation without rales or wheezes. (Tr. 250). Dr. Metgud noted osteoarthritis, but Plaintiff did not mention pain in his hands. (Tr. 251, 529).

On January 13, 2010, a bone density scan revealed findings compatible with osteoporosis and a high fracture risk. (Tr. 567). On January 15, 2010, Dr. Metgud reviewed this scan and prescribed Plaintiff with calcium vitamins and alendronate to treat his osteoporosis. (Tr. 251). A foot X-ray on January 13, 2010 also revealed a small radiopaque foreign body 1mm in length and "immeasurably thin" along with "very mild degenerative change involving mostly the interphalangeal joints." (Tr. 566). Dr. Lease would later explain that this foreign body was not near the neuroma, and was instead near the big toe. (Tr. 592). Dr. Lease explained that this foreign body was "not in the area of the problem." (Tr. 630).

On February 5, 2010, Plaintiff presented to the Podiatry Clinic at the VA hospital with complaints of foot pain. (Tr. 242). He also reported numbness and "shooting" sensation in his toes, along with clicking and popping in his toes. (Tr. 242). Plaintiff was diagnosed with a neuroma and was treated with an injection of pain medication. (Tr. 243).

On March 5, 2010, Plaintiff followed up with the Podiatry Clinic. (Tr. 237). He reported continued foot pain, no lasting relief from his injection, and that pain radiated into his leg when he walked any distance. (Tr. 237).He also stated that he "wants to return to work soon and he wants this taken care of before he returns." (Tr. 237). They determined that surgery was the best way to treat his neuroma "given its size, 2-3 yr duration and impedance to his life." (Tr. 238). Dr. Kelly Yurko DPM, recommended that Plaintiff see an orthopedic surgeon. (Tr. 238). Plaintiff did not mention pain in his hands or joints. (Tr. 238).

Plaintiff saw Dr. John Lease, M.D., an orthopedic surgeon, on April 14, 2010. (Tr. 234).

Plaintiff reported that his pain was at a three on a ten point scale and numbness in his third toe "at times." (Tr. 235-36). Dr. Lease noted that attempts to treat his foot pain with an injection and a cut-out protective device had been unsuccessful. (Tr. 235). He also noted that Plaintiff "walk[ed] with a normal gait" and was wearing sneakers. (Tr. 235). Dr. Lease treated him with a steroid injection, ordered an E.M.G. and a return visit following the E.M.G. (Tr. 235). Plaintiff did not mention pain in his hands. (Tr. 235).

On June 14, 2010, Plaintiff reported to the EMG Clinic for an EMG of his low back and lower extremities and motor nerve conduction studies. (Tr. 233). The reports noted "[n]ormal study. The findings are suggestive of no evidence of lumbosacral radiculopathy or polyneuropathy at this time. However, at least five muscles should be done for radiculopathy screening." (Tr. 234, 460-61, 656-57).

Plaintiff saw Dr. Lease on his alleged onset date, July 15, 2010. Dr. Lease noted that, although the injection from April 14, 2010 had helped, his foot and toe still hurt "in part" because of "being on his feet." (Tr. 232). Dr. Lease noted that, "the longer he is on his feet, the more it hurts. It hurts especially if he has to do stooping and bending." (Tr. 232). Dr. Lease noted that compression of each foot results in a "scrutching sound, bone moving on bone." (Tr. 630). Dr. Lease opined that he was "at the present time and for the foreseeable future unable to work on his feet." He referred Plaintiff to the Podiatry unit to determine "whether he has a Morton's neuroma and whether it would be of benefit to consider removing it." (Tr. 232).  Plaintiff did not mention pain in his hands.

On July 29, 2010, Plaintiff had an MRI of his right foot. (Tr. 564). The report noted that "[t]here is no evidence of mass legion or signal abnormality to suggest a neuroma at the base of

the fourth toe… [t]here is no evidence of ligamentous or soft tissue injury." (Tr. 564). The report noted a "small amount of artifact" in the fourth and great toes "which may represent a small amount of metallic foreign body." (Tr. 564). This was the same foreign body Dr. Lease would explain was "not in the area of the problem." (Tr. 630). Prior the MRI, Plaintiff completed an MRI screening, where he stated he had no history of asthma or respiratory disease. (Tr.220).

On August 2, 2010, Plaintiff cancelled his consultation with a specialist. (Tr. 459). He later explained to Dr. Susan Werner, M.D. that he could not afford the co-pay. (Tr. 492).

On September 11, 2010, Plaintiff submitted a function report in support of his application for benefits. (Tr. 174). He reported that he was no longer able to take hikes or walk distances, stand for more than an hour, climb ladders, stoop, crouch, run, or jump. (Tr. 175). He reported that his foot pain was initially sporadic, bothering him for a day or two but then resolving for a month or more. (Tr. 182). However, the pain had increased so that it was now present every day, and the pain was constantly present to a certain degree. (Tr. 182). He also explained that he had been taking Ibuprofen as pain medicine since October of 1999. (Tr. 183). He reported that he could still mow his lawn, but that he used to be able to mow his lawn in one hour and now it takes up to four hours. (Tr. 176). He noted that he spends an hour or two at the VE hospital, American Legion, and VFW on a regular basis and spends time with others on a daily basis. (Tr. 178). He reported that he goes bowling twice a week, fishing on weekends during fishing season, and bike riding whenever he can. (Tr. 178). He had no problems with personal care. (Tr. 175).

On September 15, 2010, he reported to the Kistler Clinic Family Practice for an initial evaluation and for a second opinion of his Morton's neuroma. (Tr. 492, 501). He was evaluated by Dr. Werner and Dr. Jason Scotti, M.D. (Tr. 492). He had complaints of severe foot pain.  (Tr.

492). Dr. Scotti explained to Plaintiff that treatment by a specialist was the only definitive way to cure his pain and that going to the V.A. would be the most economical. (Tr. 492). Plaintiff indicated he understood and agreed with the plan of care. (Tr. 492). He reported only mild tenderness and had a normal gait. (Tr. 494). He was taking acetaminophen and ibuprofen for pain. (Tr. 493). Plaintiff did not mention hand or joint pain. (Tr. 492-95).

On December 22, 2010, Plaintiff saw Dr. Hema Metgud at the VA hospital for an annual exam. He had no impairment in sensory perception, activity, or mobility, and reported that he "[w]alks frequently." (Tr. 623). He also took a PHQ-9 test and got a score of 0, which indicates "no depression." (Tr. 622). He was complaining of pain in his right upper quadrant. Dr. Metgud ordered a right upper quadrant abdominal ultrasound to rule out abnormalities, which revealed a bulge in the kidney but no evidence of cholelithiasis. (Tr. 563). Dr. Metgud's notes indicate that "[i]n the interim, [Plaintiff] was seen by Orthopedics for his Morton neuroma, but [Plaintiff] decided against having any treatment for that." (Tr. 618). His pain level was 0/10. (Tr. 618). Plaintiff did not mention hand or joint pain. (Tr. 618-19).

On February 1, 2011, Plaintiff saw Dr. Metgud with a complaint of rib pain. (Tr. 611). There was "only one spot where he had pain." (Tr. 611). Plaintiff reported that he still had intermittent right foot pain, but that "pain is an acceptable level." (Tr. 613).  Plaintiff did not mention hand pain. (Tr. 614). A CT scan revealed a tiny pulmonary nodule in Plaintiff's lung. (Tr. 560). Dr. Metgud suggested a follow-up CT in six months. (Tr. 560-62). On July 27, 2011, this CT scan again revealed a "solitary tiny pulmonary nodule." (Tr. 556). Dr. Metgud referred Plaintiff to a pulmonologist to evaluate the nodule. (Tr. 609).

On August 9, 2011, Plaintiff reported to a pulmonologist to evaluate his lung nodule. (Tr.

609).  He stated that he could "do some yard work with pauses to catch his breath" but could not do "heavy work." (Tr. 608). He also stated that he could not climb more than one flight of stairs, and that climbing one flight of stairs required him to stop and use his combivent as soon as he reaches the top of the steps. (Tr. 608). The lesion was still too small to regularly picked up on tests or for a biopsy, and the pulmonologist recommended another CT scan in three months. (Tr. 608-09). Plaintiff did not mention hand or foot pain. (Tr. 608-09).

On August 10, 2011, Plaintiff saw Dr. Metgud and "denie[d] having any complaints this visit." (Tr. 602). He specifically denied shortness of breath, cough and expectoration and his lungs were "clear to auscultation without rales or wheezes." (Tr. 602). Plaintiff reported that he had not been taking alendronate for his osteoporosis, and Dr. Metgud advised him to resume taking it. (Tr. 603). Plaintiff also refused to take blood pressure medication because no one in his family had died of a heart attack. (Tr. 603). He made no mention of foot, hand, or joint pain. (602-610). His pain level was "0/10." (Tr. 602).  Dr. Metgud emphasized the importance of regular exercise and physical activity and recommended that Plaintiff "exercise at least 30 minutes 3 times per week if possible" and to increase his physical activity generally. (Tr. 606).

For opinion evidence, in addition to Dr. Lease's opinion in his July 15, 2010 treatment note that Plaintiff was unable to work, the ALJ considered reports from two non-examining state agency doctors. On October 4, 2010, Joseph A. Barrett, PhD, a non-examining state agency psychologist, completed a Psychiatric Review Technique Form. (Tr. 504). He opined that Plaintiff had depression and a history of substance abuse disorder but that these impairments were not severe. (Tr. 504). His report indicates that Plaintiff exhibits no symptoms of depression, but had a past history of depression diagnosis. (Tr. 507). He opined that these impairments

caused mild impairments in activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace, but that Plaintiff had experienced no episodes of decompensation of extended duration. (Tr. 514). He explained that he reached these conclusions because he is not receiving any treatment for depression, successfully completed treatment for alcohol addiction, and Dr. Werner's September 15, 2010 note showed no substance abuse problem and indicated Plaintiff's mental impairments were not severe. (Tr. 516).

On October 5, 2010, Dr. Mary Ryczak, M.D., a non-examining state agency physician, completed a Physical Residual Functional Capacity Assessment. (Tr. 517). She noted diagnoses of asthma, hypertension, and Morton's neuroma. (Tr. 517). She opined that Plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, stand or walk for six hours out of an eight hour workday, sit for six hours in an eight hour work day, and had no limitation in pushing and pulling. (Tr. 518). She limited Plaintiff to occasionally climbing, but opined that Plaintiff could frequently balance, stoop, kneel, crouch, or crawl. (Tr. 519). She reported that Plaintiff had no manipulative, visual or communicative limitations, and no environmental limitations aside from needing to avoid concentrated exposure to fumes, odors, dusts, gases, or poor ventilation. (Tr. 519-20). Dr. Ryczak explained that Plaintiff alleged disability due to asthma, but that Dr. Werner reported his asthma was well-controlled on medication and that his lungs were clear on September 15, 2010. (Tr. 522). She explained that Plaintiff alleged disability due to Morton's neuroma, but his September 15, 2010 exam showed a normal gait, no edema, motor or sensory defects, and reported only mild tenderness. (Tr. 522).  She also noted that Plaintiff did not need an assistive device and has not been prescribed narcotic medication for his

pain. (Tr. 522).

At the hearing before the ALJ, Plaintiff testified that his Morton's neuroma, asthma, and arthritis in his hands caused limiting symptoms. He did not allege any limiting symptoms from hypertension, osteoporosis, or his mental impairments. Plaintiff testified that his Morton's neuroma caused limitations in walking and carrying because it causes him "excruciating pain" when he puts pressure on his toes, and that burning in his feet sometimes woke him up at night. (Tr. 38, 52). Plaintiff testified that, aside from prescription Tylenol and ibuprofen, he was not taking any other medications for his pain, using assistive devices, or receiving other treatment (Tr. 40-41). Plaintiff testified that his doctors told him he would be "better of just leaving [the neuroma] alone." (Tr. 42). He had tried shoe inserts, but they did not help (Tr. 50). Plaintiff testified that he could no longer do the stooping required to garden, and can only mow the lawn if he takes frequent breaks. (Tr. 42). However, he lived alone in a two-story house with a small yard on the side. (Tr. 36-37). Aside from when his son came to help him approximately once a month, he was able to take care of maintaining his home. (Tr. 42).Plaintiff testified that he had pain in his hands, and though that it was from arthritis (Tr. 38). He testified that his only treatment for hand pain were over-the-counter topical ointments. (Tr. 39). Plaintiff testified that he has to use his "puffer" to deal with breathing problems three to four times a day. (Tr. 47). He testified that his breathing problems gave him difficulties climbing stairs. (Tr. 47-48). Plaintiff testified that he also had joint pain (Tr. 57).

The ALJ asked the vocational expert whether a claimant with Plaintiff's RFC, as described below, could perform Plaintiff's past relevant work. (Tr. 64-67). The vocational expert testified that, although such a claimant could not engage in any of Plaintiff's past relevant work

as actually performed, a claimant could engage in Plaintiff's past relevant work as an assembler as defined by the DOT. (Tr. 67).

The ALJ found that Plaintiff was insured through December 31, 2013, and has not engaged in substantial gainful activity since July 15, 2010, the alleged onset date. (Tr. 104, Findings 1-2). The ALJ found that Plaintiff's Morton's neuroma, chronic obstructive pulmonary disease ("COPD") and osteoporosis are medically determinable and severe. (Tr. 104, Finding 3). However, while the ALJ found that Plaintiff's osteoarthritis and hypertension were medically determinable, they were not severe. (Tr. 104-05, Finding 3). The ALJ found that Plaintiff's impairments, alone or in combination, did not meet a Listing. (Tr. 105-06, Finding 4). Plaintiff does not challenge the ALJ findings at steps one through three.

Prior to proceeding to step four, the ALJ found that Plaintiff had the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c) except that he was limited to climbing ladders, scaffolds or ropes in an emergent basis or never, climbing ramps or stairs occasionally, and balancing, stooping, kneeling, crouching, and crawling frequently. (Tr. 106, Finding 5). The ALJ also found that Plaintiff must avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (Tr. 105, Finding 5). The ALJ found that, based on this RFC, the Plaintiff could perform his past relevant work as an assembler. (Tr. 109-10, Finding 6). As a result, the ALJ concluded that Plaintiff was not disabled and not entitled to benefits. (Tr. 110, Finding 7).

## VI.    Plaintiff Allegations of Error

### A.    The ALJ's credibility determination

Prior to proceeding to step four, the ALJ assessed Plaintiff's RFC. In doing so, the ALJ had to evaluate the credibility of Plaintiff's claims and testimony regarding the limiting effects of his symptoms. RFC is an assessment of the most a claimant can do on a regular and continuing basis despite credible limitations. 20 C.F.R. § 404.1545(a).  It is an administrative assessment, based on all the evidence, of how a claimant's impairments and related symptoms affect her ability to perform work-related activities. Id. Pursuant to the social security regulations, subjective symptoms, such as pain, shortness of breath, and fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings.  20 C.F.R. § 404.1529(b).  Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work. 20 C.F.R. § 404.1529(b).

The ALJ found that Plaintiff's complaints of  foot pain were not fully credible. (Tr. 106-107, Finding 5). The ALJ rejected Plaintiff's testimony in part based on several records from December of 2009 through June of 2010, all of which precede Plaintiff's onset date. (Tr. 107, 139, 217, 219, 233-35, 477-79).   The ALJ also cited to records after the onset date that show no objective evidence of a neuroma and records where Plaintiff made no mention of foot pain. (Tr. 107-09, 492-495, 565, 606). The ALJ asserted that, because Plaintiff cancelled his scheduled appointment with a specialist to treat his Morton's neuroma, he was "less than credible." (Tr. 109).  The ALJ noted that Plaintiff has attempted to return to work, pursued a GED, and reported receiving unemployment compensation for two years after his company "folded." (Tr. 49-50, 52,

108). The ALJ asserts that "[t]he fact that claimant was pursuing unemployment compensation and an employment path are inconsistent with his claims of disability." (Tr. 109). The ALJ also cited to Plaintiff's ability to live alone in a two-story house and engage in activities of daily living. (Tr. 35-36, 43-44, 63-64, 107, 174-83).

The ALJ rejected Plaintiff's complaints of symptoms from osteoarthritis because he has no deformity of the upper extremities, defects in grip strength or motor control, his lungs were clear to auscultation and his COPD was mild, and a CT scan of the thorax revealed only a tiny pulmonary nodule. (Tr. 107-08). The ALJ also noted that, although Plaintiff was prescribed alendronate and calcium with vitamin D to treat osteoporosis on January 14, 2010, he reported on August 10, 2011 that he was not taking the alendronate. (Tr. 107-08, 603).

Plaintiff asserts that the ALJ erred in making this credibility determination. The Plaintiff asserts that the ALJ gave too much weight to his receipt of unemployment benefits and pursuit of a G.E.D. (Pl. Brief at 28-30). Plaintiff also asserts that the ALJ based his credibility finding on his personal observations at the hearing and his own medical analysis. (Pl. Brief at 30-32).

The Court agrees that the ALJ erred in basing his credibility finding on Plaintiff's pursuit of unemployment, activities of daily living, failure to keep his specialist's appointment, and medical records that predate Plaintiff's onset. Plaintiff's pursuit of unemployment compensation, including his certification that he was able to work, was prior to his onset date. (Tr. 247) (noting that, on December 7, 2009, Plaintiff only had a few weeks of unemployment left). The ALJ does not cite to any evidence subsequent to Plaintiff's alleged onset date (or within six months of alleged onset date) that indicates he was pursuing unemployment compensation. With regard to the cancelled appointment, the ALJ does not mention that, at Plaintiff's September 15, 2010 visit

with Dr. Werner, Plaintiff explained that he had cancelled the specialist's appointment on August 2, 2010 because he could not afford the co-pay. (Tr. 492). Plaintiff's daily activities do not indicate that he could engage in work activities. Smith v. Califano, 637 F.2d 968, 971-72 (3d Cir. 1981) ("It is well established that sporadic or transitory activity does not disprove disability.").

However, the Court finds that the ALJ properly discounted Plaintiff's credibility because medical records from February 1, 2011 through the hearing date consistently showed that Plaintiff's foot pain was either nonexistent or at an "acceptable level." Plaintiff reported severe foot pain on September 15, 2010 (Tr. 492), but by December 22, 2010, he indicated that he walked "frequently" and that he had decided not to pursue treatment for his neuroma (Tr. 618, 623),. By February 1, 2011, he was reporting that any intermittent foot pain was at an "acceptable level." (Tr. 613). The remaining medical records through August of 2011 reveal no mention of neuroma or foot pain. The ALJ properly discounted Plaintiff's claimed hand pain because he was treated only with over-the-counter topical ointments and, aside from a note in December of 2009 (eight months before Plaintiff's alleged onset) he never mentions hand pain.

The Court finds that the ALJ properly discounted Plaintiff's claimed respiratory problems because medical records from January of 2010 through the hearing date consistently showed an absence of breathing problems. Although a note from August 9, 2011, indicated that Plaintiff had problems breathing when he climbed stairs, the ALJ accommodated for this by limiting Plaintiff to only occasionally climbing. The only medical records cited by Plaintiff during the relevant period with regard to pulmonary symptoms were the notes from his December 22, 2010 annual exam. (Pl. Brief at 8, Tr.  623). However, these notes did not reveal that Plaintiff would struggle with medium work because he reported being able to "walk[]

frequently" and did not identify any problems with lifting, carrying, or other activities of medium work. (Tr. 623). He had no impairments in activity, mobility, or sensory perception. (Tr. 623). He had no cough or expectoration and his lungs were "clear to auscultation without rales or wheezes." (Tr. 618). The Court notes that on September 15, 2010, Plaintiff reported to Dr. Werner that his asthma was "well-controlled" by daily medications. (Tr. 492).

Plaintiff cited to Progress Notes from the VA Medical Center from March 26, 2012, that reflect a severe pulmonary obstruction. These notes could support Plaintiff's claimed symptoms of shortness of breath, but these records were not before the ALJ and do not relate to the relevant time period. Instead, they were submitted to the Appeals Council. (Tr. 4-5, 112-13, 659). These records may not be considered by the Court:

> Evidence submitted after the administrative law judge's decision cannot be used to argue that the administrative law judge's decision is not supported by substantial evidence. Matthews v. Apfel, 239 F.3d 589, 594–595 (3d Cir.2001). The only purpose for which such evidence can be considered is to determine whether it provides a basis for remand under sentence 6 of section 405(g), 42 U.S.C. Szubak v. Secretary of Health and Human Servs., 745 F.2d 831, 833 (3d Cir.1984). Under sentence 6 of section 405(g) the evidence must be "new" and "material" and a claimant must show "good cause" for not having incorporated the evidence into the administrative record. Id. The Court of Appeals for the Third Circuit explained that to be material "the new evidence [must] relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." Id.

Quildon v. Colvin, 1:12-CV-2325, 2014 WL 1371584 (M.D. Pa. Apr. 8, 2014) at * 15 (Caldwell, J.). These notes are not material because they do not relate to the relevant period. Id. Instead, these notes appear to demonstrate a deterioration, as he complained of "more" cough, expectoration, shortness of breath, and wheezing. (Tr. 662).  The appropriate remedy for deterioration subsequent to the ALJ's decision is to file a new claim for benefits, not to remand the original claim to the ALJ. Sizemore v. Secretary of Health and Human Services, 865 F.2d

709, 712 (6th Cir.1988) (Plaintiff should "initiate a new claim for benefits as of the date that the condition aggravated to the point of constituting a disabling impairment").

With regard to mental impairments, Plaintiff did not testify to any limitations during the relevant period as a result of alcohol abuse, and has reportedly been sober since November 9, 2009. (Tr. 602-606). Moreover, the ALJ found that Plaintiff did not suffer more than minimal limitations from his mental impairments, that they were consequently not severe, and did not include them in his RFC analysis. Plaintiff has not challenged the ALJ's severity finding or identified any limitations he experiences as a result of mental impairments.

The Court also notes other concerns with Plaintiff's credibility. For instance, he testified that his doctors told him he would be "better of just leaving [the neuroma] alone." (Tr. 42). However, Dr. Lease had recommended the consultation with a specialist for the specific purpose of determining whether surgery was appropriate, and after Plaintiff cancelled the appointment, Dr. Werner and Dr. Scotti emphasized that the only way to alleviate his pain was to see the specialist.

"Although 'any statements of the individual concerning his or her symptoms must be carefully considered,' SSR 96–7p (July 2, 1996), the ALJ is not required to credit them, see 20 C.F.R. § 404.1529(a)." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d Cir. 2011). The ALJ's credibility finding is entitled to deference and should not be discarded lightly, given the opportunity to observe the individual's demeanor, Murphy v. Schweiker, 524 F. Supp. 228, 232 (E.D. Pa. 1981), and an ALJ's credibility determination need only be supported by substantial evidence on the record as a whole. Miller v. Commissioner of Soc. Sec., 172 F.3d 303, 304 n.1

(3d Cir. 1999). Here, substantial evidence on the record as a whole supports the ALJ's credibility determination.

**B.     The ALJ's assignment of weight to the medical evidence**

The ALJ assigned "little weight" to the opinion evidence from Dr. Lease and "agree[d]" with opinion evidence from the state agency consultant in making this credibility determination. (Tr. 109). Dr. Lease's treatment note from July 15, 2010, Plaintiff's alleged onset date (Tr. 139), opined that Plaintiff was "at the present time and for the foreseeable future unable to work on his feet." (Tr. 232). The ALJ rejects this treatment note because it "does not follow with any other finding in the record." (Tr. 108).  The ALJ explained that "every examination [by Dr. Lease] notes mild symptoms with no gait or station deficits noted." (Tr. 108). He also notes that Plaintiff does not use assistive devices, although he has tried inserts and only wears tennis shoes, and that "[e]ven by [Plaintiff's] own admission he is able to work on his feet although with alleged difficulty that elongates the tasks being performed." (Tr. 108). The ALJ asserted that "the opinion on the issue of disability expressed by Dr. Lease is purely conclusory, without any supporting explanation or rationale. It is similar to form reports in which a physician's obligation is only to check a box or fill a blank. Such conclusions are weak evidence at best." (Tr. 108). The ALJ also explained that the ultimate conclusion of disability is reserved to the Commissioner. (Tr. 108).

The Social Security Regulations state that when the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is to be given controlling weight. 20 C.F.R.  § 416.927(d)(2).  20 C.F.R. §404.1527(c) establishes the factors to be

considered by the ALJ when the opinion of a treating physician is not given controlling weight. Under 20 C.F.R. §§404.1527(c)(1) and (2), the opinions of treating physicians are given greater weight than opinions of non-treating physicians and opinions of examining physicians are given greater weight than opinions of non-examining physicians. 20 C.F.R. §404.1527(c)(2) also differentiates among treating relationships based on the length of the treating relationship and the nature and extent of the treating relationship. 20 C.F.R. §404.1527(c)(4) states that "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. §404.1527(c)(5) provides more weight to specialists, and 20 C.F.R. §404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion." An ALJ may point to inconsistencies between the physician's opinion and treatment record to assign little weight to the opinion.

The Court finds that Dr. Lease's opinion was not conclusory. Dr. Lease noted that, although the injection from April 14, 2010 had helped, Plaintiff's foot and toe still hurt "in part" because of "being on his feet." (Tr. 232). Dr. Lease noted that, "the longer he is on his feet, the more it hurts. It hurts especially if he has to do stooping and bending." (Tr. 232). Dr. Lease noted that compression of each foot results in a "scrutching sound, bone moving on bone." (Tr. 630). He referred Plaintiff to the Podiatry unit at the Manhattan VA to determine "whether he has a Morton's neuroma and whether it would be of benefit to consider removing it." (Tr. 232). These explanations and findings adequately support his opinion.

However, Dr. Lease's opinion that Plaintiff was disabled or unable to work invades the purview of the ALJ. Compte v. Astrue, 12-CV-2137, 2014 WL 199018 at *4 (M.D. Pa. Jan. 16, 2014) (Caldwell, J.) ("Dr. Malik's conclusion that Plaintiff is completely disabled and unable to

work is not "entitled to controlling weight or given special significance" because it is an opinion on a non-medical issue reserved to the Commissioner. 20 C.F.R. § 404.1527(d)."). Thus, the ALJ was not required to credit this conclusion.

Moreover, any error made by the ALJ in characterizing Dr. Lease's opinion as conclusory was harmless. Dr. Lease's note where he opined that Plaintiff was unable to work as a result of his neuroma was dated July 15, 2010, which was Plaintiff's alleged onset date. (Tr. 139, 232). He did not opine that Plaintiff was disabled permanently or even long-term. He only opined that Plaintiff was unable to work on his feet "at the present time and for the foreseeable future." (Tr. 232). However, 42 U.S.C. § 432(d)(1)(A) requires that a claimant's disabling impairments last or be expected to last at least twelve months. Id.; See also Enders v. Colvin, 1:13-CV-01987, 2014 WL 2987710 at *15 (M.D. Pa. July 2, 2014) (rejecting claimant's appeal in part because "[n]o treating physician provided a statement indicating that claimant on or prior to the date last insured suffered from severe physical or mental conditions or had functional limitations for the requisite continuous 12 month period.").

Nothing in Dr. Lease's opinion suggests that Plaintiff's neuroma will last or is expected to last at least twelve months after the alleged onset date of July 15, 2010. As discussed above, Plaintiff reported severe foot pain two months later, on September 15, 2010 (Tr. 492), but by December 22, 2010, he indicated that he walked "frequently" and that he had decided not to pursue treatment for his neuroma (Tr. 618, 623), and by February 1, 2011, he was reporting that any intermittent foot pain was at an "acceptable level." (Tr. 613). The remaining medical records through August of 2011 reveal no mention of neuroma or foot pain.

Page **22** of **27**

Thus, even if the ALJ gave great weight to Dr. Lease's opinion that Plaintiff was disabled as of July 15, 2010, he would still have had substantial evidence to conclude that Plaintiff's neuroma was not disabling for the requisite twelve months. Because Plaintiff provided no medical opinion evidence that his impairments limited or would be expected to limit his ability to work for the requisite twelve months, and the record as a whole indicates that Plaintiff's foot pain had subsided by February 1, 2011, any error in assigning weight to the medical opinions was harmless.

The Plaintiff is essentially challenging the ALJ's conclusion that he could engage in medium work because his foot pain precluded him from ambulating. Thus, the Court must determine whether substantial evidence supports the ALJ's conclusion that Plaintiff could engage in medium work. Although Plaintiff provided evidence that he was limited for a period of a few months as a result of foot pain, he does not produce evidence that his foot pain limited or was expected to limit his ability to engage in medium work for the requisite twelve months. Nor did Plaintiff provide sufficient evidence that his shortness of breath limited him during the relevant period. The ALJ properly discounted Plaintiff's testimony about his subjective symptoms. The ALJ properly discounted Dr. Lease's opinion that Plaintiff was "disabled," and even if he did not properly discount this opinion, it did not suggest that Plaintiff's disability lasted or was expected to last twelve months. Plaintiff failed to produce any significant objective medical evidence to support his claims that he could not engage in medium work. A reasonable mind could accept the relevant evidence as adequate to support the ALJ's conclusion that Plaintiff could engage in medium work, with some restrictions. Thus, substantial evidence supports the ALJ's RFC assessment.

**C.     The ALJ's use of VE testimony to find Plaintiff could perform past relevant work**

At step four, the ALJ found that Plaintiff could perform his past relevant work as an assembler because "[t]his work does not require the performance of work-related activities precluded by [Plaintiff's] residual function capacity."   (Tr. 109-10, Finding 6). The ALJ explained that the VE "testified that the claimant was still able to perform his past relevant work as an assembler." (Tr. 110). At the hearing, the ALJ asked the vocational expert whether a claimant with Plaintiff's RFC could perform Plaintiff's past relevant work. (Tr. 64-67). The vocational expert testified that, although such a claimant could not engage in any of Plaintiff's past relevant work as actually performed, a claimant could engage in Plaintiff's past relevant work as an assembler as defined by the DOT. (Tr. 67). However, Plaintiff asserts that, because the ALJ made no specific findings with regard to the mental demands of his past relevant work as actually performed, the case must be remanded for further development of the record. (Pl. Brief at 18) (citing S.S.R. 82-62).

To the extent that S.S.R. 82-62 requires an ALJ to make specific findings as to the physical and mental demands of past relevant work when the ALJ concludes that a claimant can engage in past relevant work as *actually* performed, such findings are not necessary when the ALJ relies on the testimony of a vocational expert to conclude that Plaintiff can engage in past relevant work as *generally* performed. SSR 82-61 provides that there are three tests to determine whether a claimant can perform past relevant work. Under the third test, the claimant does not need to be able to perform the past relevant work as actually performed. Instead, the claimant only needs to be able to perform the past relevant work as it exists in the national economy:

> Whether the claimant retains the capacity to perform the functional demands and job duties of the job as ordinarily required by employers throughout the national economy.

(The *Dictionary of Occupational Titles* (DOT) descriptions can be relied upon--for jobs that are listed in the DOT -- to define the job as it is *usually* performed in the national economy.) It is understood that some individual jobs may require somewhat more or less exertion than the DOT description.

A former job performed in by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy. Under this test, if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be "not disabled."

Id. (emphasis in the original); Garibay v. Comm'r Of Soc. Sec., 336 F. App'x 152, 158 (3d Cir. 2009). The regulations explicitly provide that:

[A] vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.

20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2). The Third Circuit has held that such vocational expert testimony constitutes substantial evidence:

After the ALJ properly concluded that [claimant] had the RFC to perform light work, it considered the vocational expert's testimony, based on the hypothetical question representing all of [claimant's] credible impairments. The vocational expert testified that [claimant] could perform her past relevant work, as it is generally performed in the national economy. Therefore, the ALJ's determination that [claimant] was ineligible for DIB is supported by substantial evidence.

Diaz v. Comm'r of Soc. Sec., 440 F. App'x 70, 73 (3d Cir. 2011) (citing 20 C.F.R. § 404.1560(b)(2)).

Here, the ALJ elicited testimony from the VE that, based on Plaintiff's RFC, he could perform his past relevant work as an assembler as it is generally performed in the national

economy. This constitutes substantial evidence for the ALJ's finding at step four that Plaintiff is not disabled.

### D.   The ALJ's failure to utilize the Grids or proceed to step five

Plaintiff also asserts that the ALJ failed to utilize the Grids. However, the Grids are only utilized at step five. Pursuant to the social security regulations:

> If we find that you have the residual functional capacity to do your past relevant work, we will determine that you can still do your past work and are not disabled. We will not consider your vocational factors of age, education, and work experience or whether your past relevant work exists in significant numbers in the national economy.

20 C.F.R. § 404.1560(b)(3); Diaz v. Comm'r of Soc. Sec., 440 F. App'x 70, 73 (3d Cir. 2011) (Because the ALJ's decision to deny Diaz benefit at step four was supported by substantial evidence, the ALJ was not required to reach the fifth step. *See* 20 C.F.R. § § 404.1520(g), 416.920(g)). Thus, the Court finds no merit to this allegation of error.

### VII.   Recommendation

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1382c; Brown, 845 F.2d at 1213; Johnson, 529 F.3d at 200; Pierce, 487 U.S. at 552; Hartranft, 181 F.3d at 360; Plummer, 186 F.3d at 427; Jones, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner,

then the Acting Commissioner's determination is supported by substantial evidence and stands.

Monsour Med. Ctr., 806 F.2d at 1190. Here, a reasonable mind might accept the relevant

evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.       This appeal be DENIED, as the ALJ's decision is supported by substantial

evidence; and

II.      The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: July 29, 2014                         _____s/Gerald B. Cohn_____
                                             GERALD B. COHN
                                             UNITED STATES MAGISTRATE JUDGE